810 A.2d 1119 (2002)
355 N.J. Super. 499
Kathleen SACCI, individually and Kathleen Sacci as Guardian ad Litem for Carla Sacci, Kristina Sacci, Jenna Sacci and Alaina Sacci, and Kathleen Sacci, Executrix of the Estate of John A. Sacci, Plaintiffs-Appellants,
v.
Linda METAXAS, Defendant-Respondent, and
Gerasimos "Jerry" Metaxas and the Estate of Gerasimos "Jerry" Metaxas, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 2002.
Decided December 6, 2002.
*1121 Katherine G. Houghton, Paramus, argued the cause for appellants.
Michelle Wall, Paramus, argued the cause for respondent (Melli, Guerin & Melli, attorneys; Ms. Wall, on the brief).
No other parties participated in this appeal.
Before Judges PETRELLA, LINTNER and BILDER.
*1120 The opinion of the court was delivered by PETRELLA, P.J.A.D.
This appeal presents the issue of whether a spouse has a duty to warn a potential victim of her husband's violent propensities when intoxicated, or to take some preventive action because of an alleged potential physical threat to the victim.
The plaintiffs sued Linda Metaxas and her husband's estate. The claims against Linda were on the theory that she failed to warn the victim, John A. Sacci (Sacci), that her husband, Gerasimos "Jerry" Metaxas (Jerry) was potentially dangerous and that by buying him beer she allowed his violent behavior to continue. The plaintiffs obtained a consent judgment against Jerry's estate for $3.5 million. The claim against Linda was dismissed on summary judgment on the ground that under New Jersey law Linda had no duty to warn the deceased. Plaintiffs appeal that dismissal of their complaint against Linda.
Linda, a teacher, met Jerry in January 1974. They were married on April 6, 1974, and had two children. Jerry's previous marriage ended in divorce, supposedly because his first wife had been having affairs. Linda never knew for certain what prompted the divorce, and commented that Jerry often had his "own version of things."
Jerry somehow conceived the idea that Linda was having an affair with one of her former co-workers. After believing for a year that Linda was committing adultery, when in fact she was not, Jerry waited outside Sacci's place of work on February 12, 1998, and shot and killed Sacci, who was then a teacher at a Hoboken high school. Jerry then killed himself. Sacci was survived by his wife and their four children who are plaintiffs in the present matter along with Sacci's estate.
The circumstances leading up to the shooting involved Jerry's mistaken belief that his wife was having an extramarital affair with Sacci. Throughout his marriage to Linda, Jerry was a heavy drinker. In discovery, Linda said she was aware of her husband's drinking problem. She generally purchased one or two cases of beer a week for her husband, kept his alcohol consumption to herself, and did not tell people outside of the home how much he drank. He most recently worked as a painter for the Schubert Organization, a *1122 theater company in New York. When he came home from work, he would usually begin drinking. Typically, he would drink six or more beers a night at home and became drunk three to four times a week. Jerry also drank on the weekends, and perhaps sometimes while at work. However, his drinking apparently did not cause any problems in his employment in New York.
In discovery Linda said that Jerry hit her four or five times. The first incident occurred before they were married. On other occasions, Jerry hit Linda over trivial disputes while he was drunk. Within the year before Sacci's murder, Jerry hit Linda with a hammer. Besides hitting Linda, Jerry shoved her many times. In addition to physical abuse, Jerry expressed anger by breaking things, including dishes, chairs and lamps. On one occasion Linda called the police to the scene, but no report or domestic violence complaint was ever filed.
In discovery, Linda claimed that these incidents were not serious. Generally, she did not report them to the police or tell anyone about them. She never filed a domestic violence complaint, although at one point Linda threatened to leave Jerry if he continued to hit her. Linda never sought professional assistance or medical treatment for any injuries sustained as a result of the abuse. Jerry apparently was never abusive towards the children.
Jerry had a confrontation with a co-worker in 1983, which resulted in both of them being fired. Jerry also once had a verbal argument with Linda's brother. Nothing in the record indicates that Jerry had a criminal record or was ever arrested.
Linda described her husband as an intelligent, complex man who could be belligerent and jealous, especially when he drank. During the year leading up to the incident with Sacci, Linda said that living with Jerry was very stressful and that he had a certain "meanness" to him. In her interview with the police after the shooting, Linda expressed her belief that Jerry was "chemically imbalanced." However, in her deposition, she did not remember saying this and said that she was not qualified to make such a determination.
Linda met Sacci in the early 1980s while then working as a teacher in the same school in Hoboken. Sacci and Linda were friendly, although their families did not socialize. Linda met Saccis's wife, Kathleen, at a Christmas party at work, though the Saccis never met Jerry and did not know what he looked like. The two families exchanged Christmas cards. In 1990, Sacci was transferred to the high school. Linda had not seen Sacci for approximately seven years prior to the shooting.
In February 1997, Jerry accused Linda of having an affair with Sacci. It is undisputed that Jerry's accusation was false and that Linda and Sacci never had a romantic relationship. Linda said that the accusation came "out of the clear blue," but Jerry continued in his belief and talked about it almost daily.
Jerry sent back a crumpled up Christmas card from the Saccis that he believed Linda had saved because of her feelings for Sacci. Jerry then wrote Kathleen a letter on March 1, 1997, in which he discussed his belief that their respective spouses were having an affair and urged Kathleen to call him to discuss the matter. He claimed to have a copy of Linda's diary and calendar which provided proof of the affair. Those documents apparently did not exist. Kathleen was shocked when she received the letter, but the Saccis decided to ignore it.
According to Kathleen, Jerry then called Sacci at the high school and made accusations about the alleged affair. However, the exact nature of the conversation *1123 is unknown. After the telephone call, Sacci and his wife consulted an attorney who sent a letter to Jerry dated March 14, 1997, threatening criminal and civil actions against him if the threatening and harassing telephone calls and correspondence continued. The letter also told Jerry to stop making false accusations. After receiving this letter, Jerry called Sacci at work and apologized for the misunderstanding. Sacci hung up on Jerry. Kathleen stated that after this conversation, she and her husband believed that the problem with Jerry was over.
However, Jerry apparently continued in his belief that Linda was having an affair. During the year leading up to the shooting, his drinking problem worsened and he became increasingly hostile. Jerry contacted Linda's friends and even claimed to have hired a private investigator. He tried to obtain Sacci's work schedule, obtained his license plate number, apparently stalked Sacci, and bought a handgun, all, according to Linda, without her knowledge.
In June 1997, Jerry was pulled over for driving while intoxicated. He pled guilty and lost his driver's license. Linda acknowledged that Jerry had driven while drunk on prior occasions, although he had not been caught. Afterward, his family tried to get him to see a therapist about his drinking problem. However, once he realized what was happening, Jerry left the therapist's office. Despite being given the therapist's card, Jerry never called.
Later that summer, Jerry drank alcohol while on Valium prescribed by his dentist. After taking both substances, Jerry sat in a chair for four hours without moving, and was unresponsive to voice or touch. Linda eventually called 9-1-1 and Jerry was taken to the emergency room at Palisades General in North Bergen.
Linda confided in a friend about the almost nightly verbal abuse she underwent. She never told this friend that Jerry hit her, though the friend did notice bruises on Linda's arms and advised Linda to leave Jerry. Linda expressed her belief that things would, "blow over." According to this friend, as of Christmas 1997, Jerry was still obsessing over the non-existent affair, but on Christmas he apologized to Linda for his behavior. In her deposition, Linda said that talk of the affair ended at Christmas 1997. However, Linda told the police that Jerry was still talking about it three weeks before the shooting.
On February 12, 1998, Jerry stayed home from work and consumed five cans of beer. He then went to Hoboken High School with his gun where he shot Sacci in the face and chest at close range as he exited the building before turning the gun on himself. It was later determined that Jerry's blood-alcohol level was 0.109 and that he left a letter to Sacci's wife in which he again stated his belief that his wife was having an affair with her husband.

I.
Plaintiffs argue that summary judgment was improper because there were genuine issues of fact as to whether the Saccis knew that Jerry continued in his belief that Sacci and Linda were having an affair after their attorney sent Jerry the letter. For the purposes of the summary judgment motion defendant accepted plaintiffs' version of the facts.
Plaintiffs also argue that the Law Division Judge failed to consider all of the facts, such as Jerry's alcoholism, the fact that Linda supplied alcohol, that Jerry only made accusations when drunk, and that there was in fact no affair. However, all of the facts that plaintiffs rely upon were in the record, and as discussed hereinafter, do not support either the imposition of a new legal duty in this case or allowing the case to proceed to trial.
*1124 We reject plaintiffs' assertion that they did not receive all reasonable inferences from the evidence, largely because many of the inferences they request are speculative and unsupported by the record. For example, plaintiffs state that Jerry must have threatened Sacci at some point. There is however, no evidence of this and Linda's deposition testimony was that Jerry never threatened Sacci. Also, plaintiffs allege that it is reasonable to infer that because Linda told friends about Jerry's suspicion, she secretly enjoyed the fact that Jerry thought she was having an affair because she was flattered that her husband thought she was that desirable. All of this is contrary to Linda's testimony that life with Jerry in the last year was unbearable and that when she did tell her friends about her home life it was out of despair, not joy. To infer that a wife would endure mistrust and alcohol and physical abuse because it made her feel attractive is hardly a reasonable inference.
Viewing the facts and the reasonable inferences therefrom in the light most favorable to plaintiffs, the law does not support the imposition of the duty the plaintiffs seek for the reasons stated herein. Summary judgment was properly granted. Brill v. Guardian Life Insur. Co. of America, 142 N.J. 520, 540, 666 A.2d 146 (1995).

II.
Plaintiffs ask us to impose a new legal duty on a spouse to warn a potential victim of her husband's violent propensities when there is a possibility of physical threat to the victim. Traditional notions of fairness disfavor creation of such an obligation, and we decline the invitation. We leave such a radical change in the law to the Legislature or the Supreme Court. See Lombardo v. Hoag, 269 N.J.Super. 36, 48, 634 A.2d 550 (App.Div.1993), certif. denied, 135 N.J. 469, 640 A.2d 850 (1994).
As a general rule, there is no duty to control the conduct of another, absent a special relationship or special circumstances among the parties. See, e.g., ibid.; McIntosh v. Milano, 168 N.J.Super. 466, 403 A.2d 500 (Law Div.1979); Restatement, Torts 2d, § 314. In deciding whether to impose a duty of care upon a party, according to J.S. v. R.T.H., 155 N.J. 330, 337, 714 A.2d 924 (1998) (citing Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993)), the following factors are taken into account:
[T]he nature of the underlying risk of harm, that is, the foreseeability and severity, the opportunity and ability to exercise care to prevent the harm, the comparative interests of, and the relationships between or among, the parties, and, ultimately, based on considerations of public policy and fairness, the societal interest in the proposed solution.
These factors are considered in the totality of the circumstances. Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 508, 694 A.2d 1017 (1997). Reasonableness, public policy, fairness and common sense also must be taken into account when imposing new legal duties. See Williamson v. Waldman, 150 N.J. 232, 245-246, 696 A.2d 14 (1997).
An important factor in applying an objective analysis is the foreseeability of the risk of harm based on a defendant's knowledge of the risk. J.S., supra, 155 N.J. at 337-338, 714 A.2d 924. When a plaintiff seeks to impose a duty on a defendant to control the acts of a third party, the plaintiff "may be required to prove that defendant was in a position to `know or have reason to know, from past experience, that there [was] a likelihood of conduct on the part of [a] third person[ ]' that was `likely to endanger the safety' of another." Id. at 388, 714 A.2d 924 (quoting Clohesy, supra, 149 N.J. at 507, 694 A.2d *1125 1017). Even if the risk is foreseeable, a legal duty does not necessarily arise. Ivins v. Town Tavern, 335 N.J.Super. 188, 195, 762 A.2d 232 (App.Div.2000). Here, the various factors do not favor the imposition of a new legal duty on a spouse to warn a third party of potential threats to the third party by the other spouse.
In certain situations potential liability to third parties has been recognized and a legal duty imposed. For instance, in Rappaport v. Nichols, 31 N.J. 188, 205-206, 156 A.2d 1 (1959), a duty was imposed on liquor license holders to third parties who are injured in automobile accidents by patrons who were served alcoholic drinks when already intoxicated. This duty was later extended to social hosts who serve alcohol to minors. Linn v. Rand, 140 N.J.Super. 212, 219-220, 356 A.2d 15 (App.Div.1976). The duty was extended even further where the public interest in controlling the use and consumption of alcohol was considered significant. Kelly v. Gwinnell, 96 N.J. 538, 552-555, 476 A.2d 1219 (1984).
In Finney v. Ren-Bar, Inc., 229 N.J.Super. 295, 297, 551 A.2d 535 (App.Div.1988), a dram shop was exposed to liability to a plaintiff whose house was burned down by an intoxicated patron who was a minor. The plaintiff was not required to show that the ultimate injury was foreseeable, i.e., the burning of the house, but merely that the negligent serving of alcohol would lead to harm. We observed that the "propensities of alcohol consumption to create aggressive, combative, and often reckless behavior in adults is legendary." Id. at 303, 551 A.2d 535 (quoting Alumni Ass'n v. Sullivan, 369 Pa.Super. 596, 535 A.2d 1095, 1100-1101 (Pa.Super.Ct.1987)). See also Steele v. Kerrigan, 148 N.J. 1, 26, 689 A.2d 685 (1997) (tavern could be liable for assault committed by an intoxicated underage customer).
Plaintiffs urge us in the instant matter to find an overriding public policy in the legislative and judicial imposition of liability on those who serve alcohol to others, who in turn cause harm to others. Plaintiffs first cite the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act, N.J.S.A. 2A:22A-1 to -7, commonly known as the dram shop law. This statute does not support plaintiffs' position. The legislative findings in N.J.S.A. 2A:22-2 clearly indicate that this law defined the limits of liability of licensed liquor providers because taverns were experiencing increasing difficulty in obtaining dram shop liability insurance coverage.
A stated purpose of the dram shop law is to make it easier for holders of liquor licenses to obtain insurance to protect those who suffer losses due to claimed negligent service of intoxicating liquors.[1] To achieve its ends, the law limited and defined the circumstances under which liability could be imposed. It did not create new causes of action. Thus, the dram shop law stands for neither the proposition plaintiffs assert, nor supports the creation of the duty the plaintiffs seek.
Nor do cases imposing social host liability advance plaintiffs' position. Linn, supra, 140 N.J.Super. at 219, 356 A.2d 15, and Kelly, supra, 96 N.J. at 543, 476 A.2d 1219, are based on the fact that serving alcohol to a guest, who then causes an injury in his or her intoxicated state, is *1126 the proximate cause of the harm. Alcohol has a recognized destructive element, id. at 548, 476 A.2d 1219, but the evil that the social guest cases sought to remedy is where the injury would not have occurred but for the serving of the alcohol. Proximate cause is "that combination of `logic, common sense, justice, policy and precedent' that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery." People Express Airlines, Inc. v. Consolidated Rail, 100 N.J. 246, 264, 495 A.2d 107 (1985) (quoting Powers v. Standard Oil Co., 98 N.J.L. 730, 734, 119 A. 273 (Sup. Ct.), aff'd o.b., 98 N.J.L. 893, 121 A. 926 (E & A 1923)). A plaintiff is not required to show that the ultimate harm is foreseeable; all that is required is that a harm is likely to befall a victim. Finney, supra, 229 N.J.Super. at 303, 551 A.2d 535 (quoting Alumni Ass'n, supra, 535 A.2d at 1100-1101).
Even if there was a duty to warn, it cannot reasonably be said that Linda's purchasing alcohol for her husband was the proximate cause of his shooting Sacci. The record indicates that Jerry had been planning to take action for some time. While alcohol may well have contributed to Jerry's delusions, as plaintiffs assert, Jerry also was mentally disturbed and perhaps chemically unbalanced. The instant case does not present the usual social host situation where the guest becomes intoxicated due to being served liquor and injures people or destroys property. Jerry's actions outside of Hoboken High School were not a result of drinking beer that afternoon, but rather were the result of a systematic and deliberative process, including the purchasing of a gun, before the injury was inflicted. Nothing in the record indicates that his wife knew of his activities in this regard. Hence, the rational for social host liability is not analogous to plaintiffs' claim. While deterring alcohol-induced assaults is undoubtedly a genuine public policy concern, the present case cannot be summed up in such simple terms. Thus, further intrusion into marital privacy and harmony is not warranted under the circumstances here presented.
In the cases imposing liability on social hosts who serve alcohol, courts have recognized the direct correlation between alcohol consumption and reckless conduct resulting in personal injury or property damage. See Rappaport, supra, 31 N.J. 188, 156 A.2d 1; Linn, supra, 140 N.J.Super. 212, 356 A.2d 15; Kelly, supra, 96 N.J. 538, 476 A.2d 1219; and Finney, supra, 229 N.J.Super. 295, 551 A.2d 535. Thus, hosts should be able to foresee the dangers of allowing their guests to become intoxicated or serving individuals who have already consumed too much.
But the instant matter is not simply an example of alcohol consumption leading to unfortunate results. Jerry obviously had problems dealing with reality, and while alcohol probably did not help him, and may have fueled his delusions, it cannot be said that Linda reasonably could have foreseen her husband's conduct because he drank beer and was abusive towards her. Jerry had a previous marriage and he also had believed that his first wife was having an affair. Linda never knew whether this was true or one of Jerry's misperceptions. His first marriage ended in a divorce, not an assault or murder. Furthermore, the record does not indicate that Jerry manifested a violent persona outside of his home. While he on occasions struck Linda, obviously reprehensible acts, he did not attack others, with the possible exception of the incident with a co-worker in 1983, where the facts are not known and no charges were pressed. Plaintiffs maintain that Jerry put the man in the hospital, although this is based only on Linda's memories that the co-worker was treated for injuries. Both men were fired, and no *1127 explanation of the incident was available. One fight fifteen years earlier does not provide a basis for foreseeability of this tragic murder.
In other contexts, a duty to warn, dependent on factual findings, was imposed on a psychiatrist where awareness of potential harm to a neighbor was disclosed in the course of his patient's treatment. McIntosh, supra, 168 N.J.Super. 466, 403 A.2d 500. There, an eighteen year old patient had expressed fantasies of frightening people and feelings of hostility and jealousy for his neighbors' twenty-two year old daughter, with whom the patient claimed to have had a relationship almost since they met when he was about fifteen. Id. at 472-473, 403 A.2d 500. Although the patient made threats, and expressly said he wanted the woman to suffer, and the psychiatrist contended that the patient never threatened to inflict bodily harm on her, the patient later shot and killed her. Id. at 473-474, 403 A.2d 500. The duty imposed on psychiatrists was:
to take whatever steps are reasonably necessary to protect an intended or potential victim of his patient when he determines, or should determine, in the appropriate factual setting and in accordance with the standards of his profession established at trial, that the patient is or may present a probability of danger to that person. Id. at 489, 403 A.2d 500.
While a potential professional duty of the psychiatrist was recognized as a cause of action, dependent on the jury's findings after a trial, for warning of the potential conduct of his patient, a key factor was the special expertise of the psychiatrist to know his patient's potential for violence. Id. at 487, 403 A.2d 500. No such expertise is implicated in this case, even though plaintiffs assert that Linda took courses in psychology in college to become a teacher.[2]
The obligations of parties to warn of their spouses' dangerous propensities has also been discussed in case law. Rozycki v. Peley, 199 N.J.Super. 571, 579, 489 A.2d 1272 (Law Div.1984),[3] had declined to extend a duty to a wife to warn of her husband's propensities for sexual and physical assault because of the strong public interest in protecting the marital relationship. This relationship is protected in settings such as the testimonial privilege against revealing confidential communications made between a husband and a wife. Ibid. (citing Evid. R. 23(2), now N.J.R.E. 501(2)). Indeed, the State must show a "special need" before it may wiretap a telephone used primarily by a married couple. Ibid. (citing N.J.S.A. 2A:156A-11). Rozycki concluded that forcing a person to inform the community that his or her spouse is a sexual predator would undermine the public policy considerations supporting other protections for married couples because one spouse has a duty of loyalty to the other. Id. at 579-580, 489 A. 2d 1272 (citing Nashman v. Nashman, 33 N.J.Super. 602, 111 A.2d 318 (App.Div. 1955); Frank v. Frank, 10 N.J.Super. 73, 76 A.2d 527 (App.Div.), modified, 7 N.J. 225, 81 A.2d 172 (1951)). So that "[t]o require one spouse to inform on the other strikes at the very heart of this obligation of loyalty." Id. at 580, 489 A.2d 1272.
The issue of a spouse's obligation to report the sexual assaults committed by her husband was more recently addressed in J.S., supra, 155 N.J. at 337, 714 A.2d 924. In J.S., an older man sexually abused two adolescent neighbor girls for over a *1128 year. Id. at 334, 714 A.2d 924. After he was convicted and sentenced for the criminal acts, the victims' parents sued him and his wife for their daughters' injuries. The husband conceded liability, but the wife moved for, and obtained, summary judgment in the trial court. Id. at 335, 714 A.2d 924.
In reversing summary judgment as premature and remanding in a situation involving duty to warn of the sexually predatory nature of the spouse, the Court relied on various factors. The offenses were committed on their own property and over an extensive period of time. Justice Handler recognized the secretive nature of such offenses. An issue to consider was whether a reasonable jury could find under the totality of the circumstances that the spouse "knew or should have known of the abuse and could have taken reasonable actions to have prevented such abuse." Id. at 354, 714 A.2d 924. A spouse may be able to foresee potential abuse by considering whether the other spouse previously committed acts of abuse; whether the other spouse primarily committed sexual offenses against children and the nature of these offenses; whether the spouse knew or should have known of, or encouraged or facilitated, unsupervised contact with children; and whether the victims made inappropriate sexual comments in the spouse's presence. Id. at 340, 714 A.2d 924. Also, the court noted there is some empirical support to conclude that the spouse may be in a unique position "to know that a particular person or particular class of persons is being sexually abused or is likely to be abused by her husband."[4]Id. at 341, 714 A.2d 924.
The "particularized foreseeability" (id. at 342, 714 A.2d 924) test adopted by the court was intended to: "accommodate the concerns over the inherent difficulties in predicting such furtive behavior. That test of foreseeability will also insure that the wife is not subject to a broad duty that may expose her to liability to every child whom her husband may threaten and harm." Id. at 343, 714 A.2d 924.
Another factor the Court in J.S. relied upon in imposing this duty was the legislative mandate under N.J.S.A. 9:6-8.10 requiring all citizens to report child abuse immediately to the Division of Youth and Family Services. Id. at 343, 714 A.2d 924 (citing State v. Hill, 232 N.J.Super. 353, 356, 556 A.2d 1325 (Law Div.1989)). The Court also pointed out that N.J.S.A. 2A:61B-1(a)(1) requires that any person who acts in loco parentis and "knowingly permits or acquiesces in sexual abuse of the child by another person in the household is also guilty." Id. at 344, 714 A.2d 924. N.J.S.A. 2C:7-1 to -11 also was seen as evidencing "the State's intolerance of sexual abuse of children." Ibid. J.S. also concluded that the interest in marital privacy "cannot outweigh the societal interest in protecting children from sexual abuse" because of its impact on the young victims and its effect on society as a whole. Id. at 345-347, 714 A.2d 924.
Although facially J.S., supra, 155 N.J. 330, 714 A. 2d 924, may appear supportive of plaintiffs' position, as it concerned a wife's duty to warn of her husband's criminal sexual propensities, and overruled Rozycki, supra, 199 N.J.Super. 571, 489 A.2d 1272, it addressed sexual abuse of children, which has implications not involved in the present appeal. J.S. relied heavily upon the strong public policy against such sexual abuse as buttressed by statutes which create an obligation to report child abuse, to permit overriding the traditional notions *1129 of marital loyalty and privacy. Id. at 343, 714 A.2d 924. Moreover, the holding of Rozycki was overruled "to the extent that it `places a higher priority upon preserving the defendant's marital relationship than upon protecting children from abuse.'" Id. at 346, 489 A.2d 1272 (quoting J.S., supra, 301 N.J.Super. at 157, 693 A.2d 1191). Thus, while Rozycki was overruled, presumably the principles of safeguarding the marital relationship, absent a clear mandate of public policy, are still sound. J.S., supra, 155 N.J. at 345, 714 A.2d 924. The factors taken into account in J.S. are hardly comparable to the totality of the circumstances here.
Plaintiffs also rely on Arvanitis v. Hios, 307 N.J.Super. 577, 705 A.2d 355 (App.Div. 1998), where the husband exhibited violent tendencies after he voluntarily stopped taking his medication for manic depression. Id. at 580, 705 A.2d 355. When the defendant (his wife) and plaintiff (her nephew) attempted to persuade the husband to take his medication, he stood up, knocked a container out of his wife's hands, and as plaintiff tried to intervene, he somehow put his leg through a glass coffee table. Id. at 580-581, 705 A.2d 355. The court concluded that plaintiff should be considered a social guest, who should have been warned by defendant of her husband's violent conduct when he failed to take his medication. Id. at 583-584, 705 A.2d 355.
Plaintiffs' assertion that Linda should have foreseen that Jerry would take some action against Sacci and warned him of the threat that Jerry posed is not sufficient here. The record also reflects that the Saccis knew of Jerry's jealousy and knew he was trying to get in touch with Sacci. They even had their lawyer write to warn Jerry to desist. This is a significant factor militating against any further warning to the Saccis in this case. Even what is sometimes called an "order of protection"[5] is generally not sufficient to stop a person intent on fulfilling a secret criminal mission.
In the present matter, Linda never communicated with the Saccis, did not invite them over to the house, and did not arrange a meeting between Sacci and Jerry. Without Linda's knowledge, Jerry planned his attack on Sacci. Thus, the situation in Arvanitis is not comparable to that in the instant matter. The considerations in Arvanitis do not require that a duty be imposed on a spouse in the circumstances of this case to warn a remote potential victim of the other spouse's potential violent tendancies which were exhibited only during interaction with his wife and essentially directed at her.
Moreover, even if Linda owed a duty to plaintiffs, the proofs are not sufficient for submission of the case to a jury because there is no evidence that Linda knew or could foresee that Jerry would harm Sacci. Jerry never threatened Sacci. As noted, plaintiffs contend that Jerry must have made menacing comments at some point. However, Linda denied that this ever occurred. Plaintiffs are not entitled to an inference totally unsupported by the record. Jerry believed for at least a year that Linda was having an affair. The only actions he took were to mail back the Christmas card, mail Kathleen a letter, and call Sacci at work. After the Saccis retained an attorney, Jerry apologized for his behavior and took no further overt action aimed at Sacci. Jerry's planning for his attack on Sacci was taken without *1130 Linda's knowledge. Nothing in the record controverts this. Plaintiffs do not suggest how Linda could have foreseen some form of attack on Sacci when she did not know that her husband had bought a gun. Finally, unlike J.S., Linda was not in a unique position to know of Jerry's actions. Jerry had called her friends in an effort to make a connection between his wife and Sacci.
Fairness is yet another consideration. J.S., supra, 155 N.J. at 337, 714 A.2d 924. Plaintiffs suggest possible courses of action that could have been taken by Linda to warn of Jerry's tendencies or to stop them. They suggest the following possibilities: warn the Saccis;[6] confront Jerry about his delusions; monitor his actions; stop buying him alcohol; seek professional help; take Jerry seriously; have Jerry committed; file a domestic violence complaint; report abuse to the proper authorities; or pursue a divorce or separation. These proposals not only would produce speculative results, if indeed Linda could have been successful with her husband in any of these, but also are highly intrusive and contrary to the general societal interest in preserving marriage. As Judge Harris in the Law Division aptly observed in dismissing plaintiffs' complaint, the Legislature never intended to create "private alcohol police." Plaintiffs' proposals would expose spouses to liability if they do not, for example, divorce their alcoholic partners. Such a requirement runs counter to notions of fairness.
Affirmed.
NOTES
[1] N.J.S.A. 2A:22A-4 states:

This act shall be the exclusive civil remedy for personal injury or property damage resulting from the negligent service of alcoholic beverages by a licensed alcoholic beverage server. Nothing contained herein shall be deemed to limit the criminal, quasi-criminal, or regulatory penalties which may be imposed upon a licensed alcoholic beverage server by any other statute, rule or regulation.
[2] In discovery she asserted she did not remember the substance of these classes and that she was not qualified to determine if Jerry was chemically unbalanced.
[3] Rozycki was for the most part later overruled by this court in a different case and that decision was affirmed in J.S. v. R.T.H., 155 N.J. 330, 337, 714 A.2d 924 (1998).
[4] The Court said that in child sexual abuse most molesters are married men, most child victims are female, and most assaults occur in either the victim's or the abuser's home. Id. at 341, 714 A.2d 924.
[5] This was the common name for what is now referred to as restraining orders under the Prevention of Domestic Violence Act of 1991. N.J.S.A. 2C:25-17 to 35. See specifically N.J.S.A. 2C:25-29a(6). See also Campbell v. Campbell, 294 N.J.Super. 18, 26, 682 A.2d 272 (1996).
[6] The record reflects they obviously knew of Jerry's jealousy and baseless belief in a nonexistent affair.