**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2224-17T3

HILDA RAZZAGHI, Administratrix
Ad Prosequendum for the ESTATE
OF PAYMAN HOUSHMANDPOUR
and HILDA RAZZAGHI, Individually,

     Plaintiffs-Appellants,

v.

VIRTUA HEALTH, INC., a/k/a VIRTUA
VOORHEES and MARIO MAFFEI, M.D.,

     Defendants-Respondents,

and

the ESTATE OF GIOCONDO NAVEK,
ANNAMARIE IBAY, M.D., LYNDA
BASCELLI, M.D., and JEAN BERTUOLA,

     Defendants.

_____

Submitted January 23, 2019 – Decided June 12, 2019

Before Judges Fisher and Suter.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket No. L-0292-14.

Westmoreland Vesper Quattrone & Beers, and The Ferrera Law Firm, LLC, attorneys for appellants (Rudolph C. Westmoreland, on the brief).

Fox Rothschild LLP, attorneys for respondents (William M. Honan, of counsel; Jacob Schermerhorn Perskie, on the brief).

PER CURIAM

Nineteen months after leaving his employment as a medical resident at defendant Virtua Health, Inc., Giocondo Navek murdered his girlfriend in North Carolina and drove to New Jersey, where he sought out and gunned down another Virtua medical resident, Payman Houshmandpour; Navek then fatally shot himself. Payman's widow, Hilda Razzaghi, brought this action on her own behalf and on behalf of her late husband's estate, and she now appeals an order granting summary judgment that dismissed the negligence counts of her complaint. She alleges that defendants, including Mario Maffei, M.D., who was the supervisor of Virtua's residence program, should be held liable for her husband's death.[1]

---

[1] Other defendants, who are not respondents, include the Estate of Giocondo Navek, Annamarie Ibay, M.D., Lynda Bascelli, M.D., and Jean Bertuola.

Plaintiff filed a twenty-count second amended complaint. Counts one and two alleged negligence against Virtua and Maffei. Count six alleged gross negligence by all defendants. Count seven alleged medical malpractice by Maffei. Count eight pleaded a wrongful death claim under N.J.S.A. 2A:31-4 and count nine a survivorship claim under N.J.S.A. 2A:15-3. In 2013, defendants' Rule 4:6-2(e) motion to dismiss was denied and we denied leave to appeal. Defendants' motion for partial summary judgment to dismiss these counts was granted in August 2017. The parties stipulated to the dismissal of the remaining counts of the complaint in December 2017 and plaintiff appealed.

I

A

Houshmandpour and Navek were first-year residents employed by Virtua in its Family Medicine Residency Program. At the change of shifts on May 20, 2010, Houshmandpour asked Navek "for a sign out" and Navek mentioned a patient who had colitis "as he proceeded to leave the building." When Houshmandpour asked for more details, he alleged:

> Navek came back to the residents' lounge, took his white coat off, hung it on the door, and closed the residents' lounge door; at this point I was sitting behind the computer and was checking my emails. He leaned towards me, irritated, angry, with little control over himself and a shaking voice, asking me what my

A-2224-17T3

> problem was and that he has been "working his ass off during the night"; at this point he was within inches from my face so I tried to calm him down by simply asking if there was anything I needed to follow up on the . . . patient and if he ha[d] any details besides the diagnosis. He stepped back, took his white coat off the hanger and started laughing and said "you all need to learn your fucking medicine" as he proceeded to leave the room.

Houshmandpour did not report the incident to Maffei, but in June 2010, another resident who saw the incident, reported it. Maffei contacted the Human Resources department. Defendant Bertuola advised him to obtain a written statement about the incident from Houshmandpour, if possible. Maffei met with Houshmandpour and his advisor, defendant Ibay. Maffei asked Houshmandpour to memorialize the incident in writing. He claims he did not pressure Houshmandpour to do this and that he "just wrote it up." Maffei denied promising Houshmandpour to keep his identity private and not to use the letter for further action against Navek.

Plaintiff alleges her husband was reluctant to prepare the memo but felt he had to or it would reflect negatively on his employment. She claimed that Maffei promised he "would not take any action on this letter," and that the letter would go to Human Resources "for his own personal file." Houshmandpour prepared the undated memo. Maffei then contacted Bertuola, advising her in an

4

email that although Houshmandpour "was not interested in pushing this any further," he "felt compelled" to do so because of some prior negative input from the nurses about Navek and also because of the "possibility for the safety of the other residents, as [he] can almost feel that heightened physical aggression may occur if this continues." Maffei decided to suspend Navek while they investigated the incident.

There were prior issues with Navek involving his interactions with staff. It was claimed that he was "arrogant" toward the nurses and showed "confrontational behavior." He had "disputes" on two occasions with attending physicians. It was alleged he "tend[ed] to fly off the handle quickly and react rather than think through [the] process regarding emotional and patient care issues." He showed "[o]ver-aggression in dealing with cases." Maffei met with Navek, listed specific behaviors that he needed to regularly exhibit and advised Navek he was "at risk for being removed from the program" if he did not improve. He initially seemed to improve.

A few months later, Navek was reported for having left a lecture before it was completed. He subsequently approached the lecturer in the doctors' lounge and "[s]he felt that his tone and behavior were threatening, and she felt nervous." Although he "did not physically approach her," she reported that "he was red in

5

the face" and told her "[y]ou will feel so bad."  He was upset and said he would have "cursed her out" were she not a woman.  She locked "herself in the call room."

About the incident, Navek explained that he had to leave early to take his child to the doctor and after explaining this to the lecturer, she acknowledged she should have spoken with him before reporting the matter to Maffei.  Navek was told by Maffei to maintain more appropriate "non-confrontational" workplace behaviors, to take courses on identifying and managing aggressive behaviors and "crucial conversations," and if needed, to "avail himself of the services available confidentially through Carebridge."

A "resident critical incident report"[2] was made in May 2010 about Navek's "medical judgment, professionalism and interpersonal skills," but investigation of the issues largely favored Navek.  His medical knowledge was not the major issue; rather it was his "[i]nterpersonal [s]kills and [c]ommunication with the nurses."  Navek was counselled by Human Resources about his behavior; he was given "another opportunity to show that he can change and improve . . . ."  If he did not "improve and sustain improvement," the report stated that "he will be

---

[2] A "critical" incident is defined as "an adverse incident occurring in the hospital or ambulatory sites, which is outside the expected range of resident behavior."

A-2224-17T3

made to leave the program." Specifically, "[a]ny other specific issue that arises related to his behavior that [is] counter to Virtua['s] core values . . . will result in immediate termination from the program."

Maffei and defendant Bascelli met with Navek on June 17, 2010, about the incident with Houshmandpour. Reportedly, two security guards were posted outside the conference room. Navek was "asked to talk about an issue that occurred between him and another resident" and Navek immediately "started going into his version of an incident that occurred between him and [Houshmandpour]." Navek reported that "[Houshmandpour] was upset with [Navek] previously because of a separate incident," and that day "[Houshmandpour] was all huffy" and walked right passed him. "He denied the allegations that he went back to the call room, shut the door, took off his coat, and had further conservation with [Houshmandpour]." He reported "no personal space was invaded" during the encounter. When Maffei told Navek he would be suspended during the investigation about this incident, Navek was upset and resigned instead. Maffei denied that he identified Houshmandpour in the meeting or that he told Navek he had a memo from Houshmandpour.

Plaintiff testified in her deposition that Houshmandpour was "panicked." She said "we were afraid for our lives and we knew of his anger problems."

7

Plaintiff testified that despite this, they did not take any additional security measures.

Following Navek's resignation, he accepted a job in North Carolina. Nineteen months later and unknown at the time, Navek shot and killed his girlfriend in North Carolina. He then drove to New Jersey. On the morning of April 11, 2012, after Houshmandpour backed his car out of the driveway, Navek opened fire on Houshmandpour, killing him. Shortly after, Navek shot and killed himself.

B

Defendants' motion for partial summary judgment to dismiss the negligence causes of action alleged that defendants did not owe a duty of care to plaintiff because the ultimate harm that occurred was not reasonably foreseeable. They argued that to impose a duty on the hospital would be contrary to public policy. Defendants contended there were no genuine issues of material fact that would preclude summary judgment. They argued that the prior order entered under Rule 4:6-2(e) was not the law of the case even though that judge found defendants had a legal duty to plaintiff.

Plaintiff opposed the motion for partial summary judgment arguing that defendants had a duty not to place Houshmandpour in danger because they knew

8

Navek was "a dangerous person." She argued defendants could have terminated Navek earlier. They did not handle the meeting properly and did not protect Houshmandpour. Plaintiff argued that defendants had a duty "not to place someone else at a risk of harm" when they knew about the danger. Plaintiff contended the prior ruling on defendants' motion to dismiss was the law of the case.

The trial court granted defendants' motion for partial summary judgment, finding that "defendants did not owe a legal duty to the decedent." It concluded the law of the case doctrine did not apply. The prior ruling on the issue of duty was made by another judge in the context of a Rule 4:6-2(e) motion before discovery was completed.

The trial court rejected as unworkable plaintiff's suggestion that defendants had a duty not to reveal Houshmandpour's identity to Navek because under that standard, they "could neither confront [Navek] nor allow his conduct to continue unabated." The court found "nothing in the record indicat[ed] it was reasonably foreseeable that [Navek] would physically harm the decedent."

The court found defendants had a duty to Navek to tell him about the basis for their decision to suspend him pending the investigation and to give him

an opportunity to respond. Not telling Navek, would "violate [Navek's] rights to a fair procedure."

On appeal, plaintiff argues that the earlier ruling, finding the existence of a duty, was the law of the case that should have been applied. She contends the trial court erred by not finding there was a duty to protect Houshmandpour from retaliation by Navek. It was reasonably foreseeable, according to plaintiff, that there might be retaliation. Plaintiff argues Maffei deviated from the standard of care for a physician, basing her argument on the opinions of her expert witnesses. She contends that defendants did not have a legal duty to disclose the Houshmandpour incident to Navek.

II

"[W]e review the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). "The trial court's conclusions of law and application of the law to the facts warrant no deference from a reviewing court." W.J.A. v. D.A., 210 N.J. 229, 238 (2012) (citing Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"While 'genuine' issues of material fact preclude the granting of summary judgment . . . those that are 'of an insubstantial nature' do not." Brill, 142 N.J. at 530 (quoting Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75 (1954)). "An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande v. St. Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)); see R. 4:46-2(c).

Plaintiff's complaint asserts negligence claims against defendants. "To prevail on a claim of negligence, a plaintiff must establish four elements: (1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages." Fernandes v. DAR Dev. Corp., 222 N.J. 390, 403-04 (2015); Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013). "[W]hether a defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court

to decide." Morris v. T.D. Bank, 454 N.J. Super. 203, 209 (App. Div. 2018) (alteration in original) (quoting Robinson v. Vivirito, 217 N.J. 199, 208 (2014)). The scope of that duty is also a matter of law. Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 502 (1997).

Duty is a question of "fairness and public policy that 'involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" Carter Lincoln-Mercury, Inc. v. EMAR Ground, Inc., 135 N.J. 182, 194 (1994) (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)).

While foreseeability of an injury "does not itself establish the existence of a duty," it is "a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate." Ibid. "Subsumed in the concept of foreseeability are many of the concerns we acknowledge as relevant to the imposition of a duty: the relationship between the plaintiff and the tortfeasor, the nature of the risk, and the ability and opportunity to exercise care." Ibid. Once foreseeability is established, we must then determine whether the imposition of such a duty would be appropriate considering fairness and public policy. Robinson, 217 N.J. at 208 (citing Carvalho v. Toll Bros. & Developers,

143 N.J. 565, 573 (1996)). "Foreseeability requires a determination of whether the defendant was reasonably able to ascertain that his allegedly negligent conduct could injure the plaintiff in the manner it ultimately did." Id. at 212 (citing McDougall v. Lamm, 211 N.J. 203, 225-26 (2012)).

The issue is whether defendants had a legal duty to Houshmandpour not to place him at risk by disclosing either the incident or his identity to Navek. We assume the facts as plaintiff has alleged them: that defendants disclosed Houshmandpour's identity to Navek when they advised Navek about the incident. Defendants dispute these facts, arguing that they all are based on hearsay.

There was no evidence that Navek had been physically violent in any of his interactions. Plaintiff's testimony in her deposition was that Navek had not been physically violent but "verbally violent" because he had a reputation of being "loud" and "talk[ing] back to any attending." Her husband never told her that Navek had made a threat of physical harm. His letter did not report any threat of physical violence. The doctor who reported Navek leaving a seminar early "felt his tone and behavior were threatening, and she felt nervous," locking "herself in the call room," but there was no physical violence.

In Sacci v. Metaxas, 355 N.J. Super. 499, 507 (App. Div. 2002), the issue was whether the court would "impose a new legal duty on a spouse to warn a potential victim of her husband's violent propensities when there is a possibility of physical threat to the victim." We found that a murder was not foreseeable even though the perpetrator had a long history of violence toward his wife. Id. at 516-18. Unlike Sacci, no threats were made to Houshmandpour by Navek and there was no information that Navek had a gun, making it even less foreseeable that Navek would murder Houshmandpour nineteen months after resigning.

In Peguero v. Tau Kappa Epsilon, 439 N.J. Super. 77, 80 (App. Div. 2015), the issue was the legal duty, if any, owed by a college fraternity and its officers to a guest "injured while attending social gatherings at premises used as a fraternity house." There were no past incidents "involving guns on the premises or involving violent criminal behavior." Ibid. We held that it was not "reasonably foreseeable that plaintiff would have been shot by a third party while attending the fraternity event." Ibid. Similarly, there was no evidence linking Navek to gun violence or that he had committed any violent criminal behavior in the past.

In Hanna v. Stone, 329 N.J. Super. 385, 388-89 (App. Div. 2000), the issue involved the alleged negligent failure by homeowners to supervise all visitors and invitees. We found that a fistfight between two teenage boys was not sufficient to establish that a single punch between the two at a classmate's birthday party six months later was reasonably foreseeable. Id. at 390.

We find there was no duty by defendants in this case to warn or protect. At the time Navek murdered Houshmandpour, he had not been employed by defendants for nearly two years and he had relocated to North Carolina. There was no open investigation because he had resigned. There was no evidence that Navek had stayed in contact with defendants or with Houshmandpour. Whether defendants actually disclosed Houshmandpour's name is not material because any discussion of the incident would have pointed in that direction. Defendants were not in a position to ignore the issue as Navek's behavior had been the subject of a number of complaints. There was no reason to think that Navek would single out one employee from the others who had complained; plaintiff gave no reason why that would be so with respect to her husband. Defendants did not exercise any control over Navek in the nineteen months since he was not employed. Defendants had no ability to monitor Navek after he left their employment. Defendants attempted to address Navek's conduct in June 2010 by

meeting with him and requiring him to go to courses. There was nothing in the record that would foretell that Navek would return nearly two years later to Houshmandpour's house and murder him. There was no history of violent physical acts by Navek. We agree with the trial court that "defendants did not possess knowledge making the possibility that [Navek] would attack decedent a risk reasonably . . . foreseeable." A reasonably prudent person, under the same circumstances, could not have reasonably anticipated that Navek would murder Houshmandpour.

Defendants needed to be able to investigate disciplinary problems within its institutions. Imposition of a duty as plaintiff suggests—not to discuss the issue—would not foster the public interest. Therefore, we find that defendants did not have a duty to plaintiff on these facts.

Plaintiff contends that a prior favorable ruling made in the context of a Rule 4:6-2(e) motion to dismiss was the law of the case. We find no abuse of discretion by the trial court in declining to apply that doctrine. In State v. Cullen, we said that a judge considering a summary judgment motion made its decision "not upon facts as alleged in the complaint but rather upon evidence developed during discovery. The [judge] was not bound to adhere to the [other]

motion judge's preliminary assessment of the facts." 424 N.J. Super. 566, 579-80 (App. Div. 2014).

At the time the prior motion was heard, counsel for plaintiff reminded the judge about the "very high standard" because the motion was filed under Rule 4:6-2. Plaintiff's counsel argued that the motion was "premature" because discovery was not complete. The law of the case doctrine is discretionary. Piech v. Layendecker, 546 N.J. Super. 367, 380-81 (App. Div. 2018) (citing Little v. KIA Motors Am., Inc., 425 N.J. Super. 82, 92 (App. Div. 2012)). There was no abuse of discretion by the trial court by not applying the doctrine on the question of whether a legal duty existed.[3]

After carefully reviewing the record and the applicable legal principles, we conclude that plaintiff's further arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] We also reject plaintiff's argument that the existence of a legal duty should be informed by expert opinion. The issue is a question of law for the court. Robinson, 217 N.J. at 208.