836 A.2d 840 (2003)
364 N.J. Super. 418
Angelo GALLARA, Administrator and General Administrator of the Estate of Giorgio Gallara, deceased, Plaintiff,
v.
Thomas KOSKOVICH, Jayson Vreeland, Michael Conklin, Adventure Sport, Inc., T & R Alarm System, Inc., Guy Edsall, Jason Kelly and Monitol, Inc. Defendants.
Joseph and Loretta Giordano, As Administrators ad Prosequendum for the heirs-at-law of Jeremy Giordano, deceased, Plaintiffs,
v.
Thomas Koskovich, Jayson Vreeland, Michael Conklin, Adventure Sport, Inc., T & R Alarm System, Inc., Guy Edsall, Jason Kelly and Monitol, Inc. Defendants.
Superior Court of New Jersey, Law Division.
Decided April 15, 2003.
*842 Ann M. Pompelio for plaintiff Gallara (Law Office of Ann M. Pompelio).
Christine G. Hurst for plaintiff Giordano (Fischbein, Badillo, Wagner, Harding).
David C. Bendush for defendant Adventure Sport, Inc. (Law Offices of Lane M. Ferdinand, P.C.).
Frank N. Yurasko, Somerville, for defendant T & R Alarm System, Inc. (Law Offices of Frank N. Yurasko).
Frank P. Addas, Jersey City, for defendant Monital, Inc. (Addas, Berlin, Kaplan, Dembling, Burke & Potenza, P.C.).
William F. Fitzgibbons, Franklin, for defendant Jason Kelly (Fitzgibbons and Goovaerts).
*841 GRAVES, J.S.C.
On April 8, 1997, defendant Thomas Koskovich (Koskovich) and an accomplice broke into Adventure Sport, Inc. (Adventure Sport), a sporting goods store licensed to sell firearms, located in Franklin Borough, Sussex County, New Jersey, and stole three handguns. Eleven days later, on April 19, 1997, defendants Koskovich and Jayson Vreeland (Vreeland) utilized two of the stolen handguns to murder Giorgio Gallara and Jeremy Giordano. Koskovich and Vreeland lured the victims to a remote location in Franklin Borough by telephoning the pizzeria owned by Giorgio Gallara and placing an order for a delivery. Giorgio Gallara and Jeremy Giordano were ambushed and shot to death while attempting to make the delivery.
A jury found Koskovich guilty of burglary and theft of firearms from Adventure Sport. He was also found guilty and sentenced for the murders of Giorgio Gallara and Jeremy Giordano. Similarly, defendant Vreeland was convicted and sentenced for the murder of Giorgio Gallara and the aggravated manslaughter of *843 Jeremy Giordano. The families of the victims initiated two separate wrongful death actions that have been consolidated for trial.
Plaintiffs contend that Adventure Sport negligently failed to exercise reasonable care to prevent the theft and subsequent misuse of its handguns and that such negligence substantially contributed to the wrongful deaths. Adventure Sport now seeks summary judgment claiming that "gun retailers do not owe a duty to murder victims to prevent the theft and subsequent use of a gun in murder." Alternatively, Adventure Sport argues that any negligence on its part cannot be a proximate cause of the ultimate harm because the tragic deaths of the victims resulted solely from the unforeseeable, superseding criminal conduct of Koskovich and Vreeland.
For the reasons stated herein, the law supports the imposition of the duty sought by plaintiffs. A commercial seller of firearms, such as Adventure Sport, is legally obligated to take such measures as are reasonably necessary to protect and safeguard its firearms from theft and subsequent criminal misuse. Based on the facts and circumstances present in this case, a reasonable jury could conclude that Adventure Sport's failure to adequately secure and safeguard its handguns was a proximate cause of the wrongful deaths. Accordingly, Adventure Sport's summary judgment application is denied. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
The evidence must be considered in a light most favorable to the non-moving parties, in this case the plaintiffs. R. 4:46-2; Brill, supra, 142 N.J. at 523, 666 A.2d 146. For the most part, the critical facts are not disputed. When Koskovich was apprehended, he gave a taped statement to the police admitting that two of the handguns he stole from Adventure Sport were used to kill Giorgio Gallara and Jeremy Giordano. In his statement, Koskovich acknowledged that he gained entry to Adventure Sport, after business hours, by shattering the front window of the store with a baseball bat. He then jumped through the window, smashed a glass firearms display case with his bat, and grabbed three handguns. When asked if he heard any alarms go off during the commission of the burglary and theft, Koskovich answered: "There was an alarm going off inside but it was real silent. It was a silent alarm almost. It was just like uuummm. Uuuummmm.... Quiet real quiet." After seizing the three handguns, Koskovich exited through the broken front window and escaped. A few days later, he drove to Jersey City where one of the stolen guns was traded to an unidentified stranger in return for drugs. Koskovich retained the two remaining handguns, a.22 caliber semi-automatic pistol and a .45 caliber revolver.
Koskovich had .22 caliber bullets at his house and he obtained ammunition for the revolver from a friend. Within a few days of the burglary and theft, Koskovich gave the .22 caliber pistol to Vreeland. Koskovich's statement includes the following:
Q. Did you ever take the guns and practice with them?
A. Yes we did. Ah we went to Vernon, me and Jay Vreeland and we jumped out in a couple of fields and just took a couple of practice shots just to know what the kick was like `cause I never shot a handgun before. Especially a .45.
* * *
Q. Did Jay shoot the .22?
A. Jay, yes. Jay shot the .22. He jumped out of the car and he took a couple of shots in the field.
Q. Just into the ground?
*844 A. We shot at trees. We shot a deer. Whatever was around. It was nighttime.
* * *
Q. How long had you and Jay been talking about possibly doing this?
A. Not very long at all actually. It was only like a week or two ... after we got the guns we talked about it.
Q. And .. and what were you talking about? I mean.
A. We .. I don't know, we were just talking about going nuts `cause when .. when you get a gun you go crazy.
Q. Feel powerful?
A. Yeah.
* * *
Q. So then you came up with this idea after you stole the guns?
A. Yeah. I figured a .45, you know, wooo ... that's a powerful gun. I'm gonna' keep this one.
At the time of the burglary and theft, Adventure Sport was a retail sporting goods store licensed by the State of New Jersey to engage in the sale of firearms and ammunition to the general public. The Legislature has authorized the Superintendent of State Police to promulgate appropriate security requirements for commercial sellers of firearms to ensure that their weapons are secure from theft and subsequent misuse. N.J.S.A. 2C:58-2 provides in pertinent part:
No retail dealer of firearms ... shall sell or expose for sale, or possess with the intent of selling, any firearm unless licensed to do so as hereinafter provided. The superintendent [of State Police] shall prescribe standards and qualifications for retail dealers of firearms and their employees for the protection of the public safety, health and welfare.
Prior to maintaining an inventory of firearms, Adventure Sport was required to submit a security system plan to the Superintendent of State Police (Superintendent) for approval. N.J.A.C. 13:54-6.2. The purpose of a security plan is to safeguard firearms and ammunition located on the business premises from theft. Failure to comply with any security standards "may result in the revocation of the license" of the dealer. N.J.A.C. 13:54-6.2(g). The license must be renewed every three years, N.J.A.C. 13:54-3.8, and retail dealers applying for license renewal must meet the standards and qualifications of the Superintendent. N.J.A.C. 13:54-3.10.
Commercial sellers of guns must install an alarm system, or other system acceptable to the Superintendent, to protect firearms and ammunition from theft. N.J.A.C. 13:54-6.3. In addition, N.J.A.C. 13:54-6.5 requires each retail dealer to provide "internal security methods for the safeguarding of firearms and ammunition during nonbusiness hours." A dealer is allowed to select the security methods most compatible with its business, subject to the approval of the Superintendent.
The Administrative Code provides gun dealers with a list of approved security alarm systems which includes "[a]n alarm system designated to activate a bell, gong, horn or siren located on the outside of the business premises which is audible for a minimum distance of 500 feet." N.J.A.C. 13:54-6.3. It is clear from the testimony of Keith Hughes, the owner and operator of Adventure Sport, that he had an audible security alarm system installed. At his deposition, Mr. Hughes provided the following testimony:
Q. What was your understanding what you had to have when they came to inspect?
A. Audible.

*845 Q. Let's stop there for a moment. When you say audible, what do you mean?
A. Siren.
Q. And did you have an understanding of where the siren was to be located?
A. Both internal and external.
Q. Was there any kind of a standard that you understood that the siren had to maintain? When I say that, in terms of decibels?
A. No, they don't give that.
Q. What was your understanding of the necessity for the siren?
A. Obvious that if you sustain a robbery, it will be audible. If there is any law enforcement nearby, that they can pickup on the audible signal and respond.
Q. So that it wouldn't be just a siren to be heard inside the premises. Is that correct?
A. That's correct.
Q. It's to be heard at a distance away so that if a law enforcement officer is nearby or anybody, they can move forward to try to stop this?
A. That's correct.
* * *
Q. Was the actual alarm different though in terms ofI will use the word audibility for lack of a better word?
A. The sound of the two?
Q. Yes, how loud it is.
A. I would say they're about equal, interior and exterior. They're very, very, very loud.
Q. And you know that because you've heard them go off?
A. Oh, yes.
Q. Was it your understanding that the alarm had to be heard within a certain number of feet from the premises?
A. I don't recall that.
When asked about the last time the alarm was tested prior to the April 8, 1997, burglary and theft, Mr. Hughes testified: "I don't recall, but I know that every timewe do our own personal testing about every year and then upon inspections obviously by federal and state the system is checked."
At his deposition, Patrolman Eugene McInerney, a member of the Franklin Borough Police Department, testified that his shift commander received a report of an alarm activation at Adventure Sport from the company that monitored the alarm system on April 8, 1997, at approximately 12:59 a.m. Upon arriving at the scene, Patrolman McInerney observed that the front door was secure but the store's front glass windowpane had been broken and used as a means of entry and exit. Inside the store, Officer McInerney observed that a glass display case had been shattered and he subsequently learned three handguns had been stolen from the display case. Officer McInerney was asked if he heard an audible alarm sound when he arrived on the scene and he initially answered: "I don't recall." He was then asked, "As you sit here today, do you recall hearing an alarm?" he testified, "No, ma'am, I do not."
Plaintiffs allege that Adventure Sport acted in a careless, negligent and reckless manner in failing to adequately secure and safeguard its firearms and in failing to properly maintain its audible security alarm system. Plaintiffs argue that the testimony of Patrolman McInerney and the statement given by Koskovich confirm that the audible security alarm system at Adventure Sport was not functioning properly *846 on April 8, 1997. In addition, plaintiffs claim that Adventure Sport failed to implement internal security measures required by N.J.A.C. 13:54-6.5. Those regulations mandate the following internal security measures, in addition to the alarm system, during nonbusiness hours:
1. Shotguns and rifles secured in a rack equipped with a locking device such as a metal bar or a steel cable;
2. Firearms and ammunition secured in a heavy gauge metal cabinet equipped with an adequate locking device;
3. Firearms and ammunition secured in a heavy gauge mesh wire cage equipped with an adequate locking device on the door(s):
4. Firearms and ammunition secured in safe or vault;
5. Metal bars on all windows and on glass portion of door(s);
6. Other method(s) proposed by the dealer approved by the Superintendent.

[N.J.A.C. 13:54.6.5]
Plaintiffs rely upon the findings and conclusions of their proposed expert, Thomas Prevas, to support their claim that Adventure Sport failed to adequately safeguard its guns on April 8, 1997. In his report, Mr. Prevas notes the importance of an audible security alarm system (sounder) as follows:
A loud and persistent sounder directly above the point of entry would more likely than not frighten a very unsophisticated intruder and make him think twice before venturing deep inside a store. Koskovich clearly states in his taped statement that there were no loud noises during the break-in and that he was also scared upon entering the store. I often state as an instructor in security seminars that the primary purpose of a burglar alarm is to alarm the burglar.
* * *
Adventure Sport, as the owner of the alarm system, was directly responsible for the testing of the equipment and assuring that all the components functioned properly. The failure to test the sounder and ensure it was fully operational was negligence.
Plaintiffs' proposed expert cites additional security deficiencies at the time of the burglary. According to Mr. Prevas, "the existing protection controls were both ineffective and contrary to accepted practice, industry guidelines, New Jersey Administrative Codes and relevant standards to deter and/or prevent a burglary." More specifically, Mr. Prevas reported the following:
According to the documentation, the glass front show window panels at Adventure Sport had no physical protection, such as bars, gates, burglary resistant glazing or the very inexpensive burglary resistant film placed over the existing glass panels on the door and windows to deter or resist a forced entry. Additionally, there were reportedly no physical barriers between the front show windows and a display case containing several handguns, nor any physical protection for the few guns within the container. An example of express physical protection for the handguns would be burglary resistant glazing or film on the glass panels of a heavily reinforced and securely locked special display case or placing the small firearms within a safe or other locked metal enclosure.
Based on his review of all available information, Mr. Prevas concluded that "[t]he total amount of physical protection for the Adventure Sport handguns was essentially two thin panes of glass, or in *847 practical terms, no meaningful physical protection at all." "[K]oskovich would not have been able to access the guns from Adventure Sport if basic physical and electronic security controls, commonplace in the gun dealer industry, had been operational in Adventure Sport on the night of the burglary."
In support of its application for summary judgment, Adventure Sport relies on the fact that the Superintendent initially approved its security system. Additionally, Adventure Sport passed each of the State Police inspections that took place approximately once per year and there was no history of criminal activity at the store. Therefore, according to Adventure Sport, the evidence confirms that adequate security measures were in place when the burglary and theft occurred on April 8, 1997.
The extent to which Adventure Sport did or did not comply with the Administrative Code will be a matter of proof at the time of trial. Plaintiffs are entitled to produce evidence of any Administrative Code violations to demonstrate that Adventure Sport failed to act with reasonable care. See, e.g., Alloway v. Bradlees, 157 N.J. 221, 236, 723 A.2d 960 (1999) ("[T]he violation of a legislated standard of conduct may be regarded as evidence of negligence if the plaintiff was a member of the class for whose benefit the standard was established.") The Administrative Code regulations pertaining to Adventure Sport were expressly established "for the protection of the public safety, health and welfare." N.J.S.A. 2C:58-2. Consequently, Giorgio Gallara and Jeremy Giordano were among those intended to be protected by the security measures mandated by the Administrative Code and any violations of those regulations is evidence of negligence. Adventure Sport claims it was in full compliance with all of the administrative regulations. However, even if this is so, it is not dispositive. "[C]ompliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence when a reasonable man would take additional precautions." Kane v. Hartz Mountain Industries, 278 N.J.Super. 129, 142, 650 A.2d 808 (App.Div.1994), aff'd., 143 N.J. 141, 669 A.2d 816 (1996) (quoting Restatement (Second) of Torts, § 288 C (1965)); see also Alloway, supra, 157 N.J. at 240, 723 A.2d 960 ("[T]he failure by OSHA to find a violation against a particular party does not preclude a determination that the party nevertheless was subject to a duty imposed by OSHA regulations and that the standards prescribed by OSHA were violated.").
Of course, proof of negligence requires "establishment of a duty of care and a breach thereof proximately causing the harm." Ivins v. Town Tavern, 335 N.J.Super. 188, 194, 762 A.2d 232 (App.Div.2000). "In addition to showing that a defendant failed to act with reasonable care, a plaintiff must show that a defendant owed the injured party a duty of care." Pfenninger v. Hunterdon Central, 167 N.J. 230, 240, 770 A.2d 1126 (2001). Whether a duty exists is a matter of law to be decided by the court. Carvalho v. Toll Bros. & Dev., 143 N.J. 565, 572, 675 A.2d 209 (1996).
That inquiry involves identifying, weighing, and balancing several factorsthe relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct. (citations omitted)
*848 [Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993) ]
In fixing the limits of liability as a matter of public policy, courts must "draw on notions of fairness, common sense, and morality." Id. at 443, 625 A.2d 1110. "[T]he question whether there is a `duty' merely begs the more fundamental question whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." J.S. v. R.T.H., 155 N.J. 330, 338, 714 A.2d 924 (1998) (quoting Weinberg v. Dinger, 106 N.J. 469, 481, 524 A.2d 366 (1987) (internal quotation and citation omitted)). "Ultimately, the determination of the existence of a duty is a question of fairness and public policy." Kuzmicz v. Ivy Hill Park Apartments, Inc., 147 N.J. 510, 515, 688 A.2d 1018 (1997).
The primary issue for resolution is whether Adventure Sport breached any duty owed to the plaintiffs. Adventure Sport contends that it had no duty "to prevent the theft and criminal use of guns with respect to the plaintiffs." The question of whether a commercial seller of firearms can be liable when a firearm is stolen and subsequently used for criminal purposes has not been decided in this State. Therefore, the court looks "to the logic, policy and rationale which underlies similar cases in this and other jurisdictions" for guidance. Burke v. Briggs, 239 N.J.Super. 269, 271, 571 A.2d 296 (App.Div.1990).
In order to obtain and maintain its license to sell guns, Adventure Sport was subject to a strict regulatory scheme. As a result of the need to comply with statutory licensing requirements and the regulations mandated by the New Jersey Administrative Code, it is reasonable to conclude that Adventure Sport was well aware of the grave risk of danger if criminals, or any other unauthorized persons, gained access to its guns. In somewhat similar circumstances, other business owners and landlords have been required to protect customers and tenants from foreseeable criminal acts occurring on their premises even though the criminal conduct was beyond their control. "If the reasonably prudent person would foresee danger resulting from another's voluntary criminal acts, the fact that another's actions are beyond defendant's control does not preclude liability." Butler v. Acme Markets, Inc., 89 N.J. 270, 276, 445 A.2d 1141 (1982). In Trentacost v. Brussel, 82 N.J. 214, 412 A.2d 436 (1980), a tenant was assaulted on the stairway leading to her apartment. Id. at 218, 412 A.2d 436. There was no lock on the front door and there was evidence that criminal activity affecting the building was reasonably foreseeable. Ibid. The Court determined that the landlord had "a legal duty to take reasonable security measures for tenant protection on the premises" because the criminal conduct was foreseeable. Id. at 231, 412 A.2d 436; see also Wlasiuk v. McElwee, 334 N.J.Super. 661, 667-68, 760 A.2d 829 (App.Div.2000) (driver of motor vehicle liable to passenger injured by criminal act of stranger whom driver allowed into vehicle, because risk of harm from giving rides to strangers was reasonably foreseeable); Ventresco v. Gokvlesh Convenience, 318 N.J.Super. 473, 478, 723 A.2d 1250 (App.Div.1999) ("All that is required is sufficient information to apprise the proprietor of the existence of danger and enough time to act on behalf of the patron's safety."); Picco v. Fords Diner, Inc., 113 N.J.Super. 465, 467, 274 A.2d 301 (App.Div.1971) ("Absence of any night illumination of ... parking area might reasonably be considered a dereliction on the part of defendant, which contributed proximately to the criminal assault.... It is common knowledge that lighting an area during nighttime hours deters criminal activity."). *849 These decisions imposed liability upon defendants for failure to protect against the criminal propensities of third persons where the likelihood of serious harm could be easily anticipated and the defendants failed to take reasonable measures to prevent the harm.
Public policy considerations are also important when determining whether a duty exists. Plaintiffs argue that because there are thousands of deaths each year from gun violence, there is a strong public need to prevent easy access to firearms. In Kelly v. Gwinnell, 96 N.J. 538, 476 A.2d 1219 (1984), the New Jersey Supreme Court determined that a social host could be liable for injuries to a plaintiff resulting from a drunk driving accident. Id. at 548, 476 A.2d 1219. Chief Justice Wilentz noted that the host could foresee quite clearly that the "continued provision of alcohol to [the driver] was making it more and more likely that [the driver] would not be able to operate his car carefully." Id. at 544, 476 A.2d 1219. Nevertheless, the primary issue focused on whether the host owed a duty to public users of the highway. Social considerations weighed heavily in the Court's decision to impose such a duty. "In a society where thousands of deaths are caused each year by drunken drivers... the imposition of a duty is both consistent with and supportive of a social goalthe reduction of drunk driving...." Id. at 544-45, 476 A.2d 1219. In Kelly, the Court determined that a social host's liability "proceeds from the duty of care that accompanies control of the liquor supply." Id. at 548, 476 A.2d 1219. Similarly, Adventure Sport controlled their inventory of handguns and derived a profit from the sale of firearms. Thus, plaintiffs contend that public policy considerations justify the imposition of a duty of care.
Adventure Sport cites Valentine v. On Target, Inc., 353 Md. 544, 727 A. 2d 947 (1999), for the proposition that "a gun store owner owes no duty to third parties to exercise reasonable care in the display and sale of handguns to prevent the theft and the illegal use of handguns by others against third parties." Id. at 948. Valentine is procedurally and factually distinguishable. In that case, Edward McLeod and an unidentified companion stole several handguns on July 17, 1993, from On Target, Inc. (On Target). More than two months later, on September 26, 1993, an unknown assailant murdered Joanne Valentine with one of the guns stolen from On Target.
A trial court granted defendant's motion to dismiss plaintiffs' wrongful death action for failure to state a claim and the intermediate appellate court agreed. On appeal, a majority of the Court of Appeals of Maryland affirmed the dismissal of plaintiffs' complaint, "[s]ignificantly, [because] the complaint [did] not describe how the handguns were displayed or what could have been done by respondent's agents to prevent the theft." Id. at 948. Furthermore, the complaint gave no details with respect to how the guns were stolen or how the stolen guns were eventually transferred to the unidentified killer. Id. at 950. The majority stressed the fact-sensitive nature of their holding and implied that with different facts the imposition of a duty to exercise reasonable care may be appropriate.
We caution that the holding in this case does not mean that a gun store owner may never be held liable to another party for negligence in the display and sale of guns when that other party is injured as a result of the negligence but rather that under the specific facts alleged in this particular case no duty was owed to this petitioner's decedent. [Id. at 953]
In a concurring opinion joined by two other judges, Judge Raker noted that the *850 majority ventured beyond the disputed issue, which was limited to the legal sufficiency of the complaint. Id. at 954 (Raker, J. concurring). Citing various authoritative studies and publications, Judge Raker stated:
Estimates for the number of guns stolen each year vary greatly. Some authorities put the figure somewhere between 65,000 and 225,000 guns annually, while others estimate that as many as 1,800,000 guns are stolen per year. Whatever the exact figure, the theft of a handgun is clearly not uncommon. This fact is significant because it is well known that stolen handguns are an important source of supply to the criminal population. Stolen guns are particularly attractive to people who intend to commit violent crimes with handguns because they are untraceable, an important characteristic to felons, and enjoy a potentially quick turnover. Moreover, under federal and state law, felons are unable to buy handguns legitimately from a licensed retail merchant. Consequently, felons steal handguns or buy them off the street.
* * *
`Stolen guns are particularly attractive to people who intend to commit violent crimes with guns because they are virtually impossible to trace.' The notion that it is not foreseeable that a stolen handgun will be used in violent crime is simply nonsense. (footnotes and citations omitted)

[Id. at 955-56]
Judge Raker determined that "retail handgun merchants owe a legally recognized duty to exercise ordinary care in securing handguns held out for public sale and that, as a matter of law, the chain of causation is not necessarily broken by intervening criminal acts." Id. at 955. Her conclusion was supported by strong empirical data and important public policy concerns. Identical considerations are relevant in this case.
In New Jersey, commercial sellers of firearms are subjected to strict licensing and regulation requirements for a reason. As demonstrated by the facts of this case, stolen guns can be easily converted to cash or drugs on the street.
[M]any guns are stolen for the same reason that many television sets or stereos are stolen, that is, to fence for cash or otherwise dispose of in the gray or black markets. Indeed, given the evident high demand, potential quick turnover, and easy portability, one can readily imagine that firearms (particularly handguns) are probably among the more desirable things to encounter in burglarizing a residence or a store.
[James D. Wright & Peter H. Rossi, Armed and Considered Dangerous: A Survey of Felons and Their Firearms, 199 (1986) ]
Furthermore, "[b]y definition, all stolen guns go directly into the wrong hands. Thus, not only is it foreseeable that guns will be stolen, it is readily foreseeable that stolen guns will be used for criminal purposes." Andrew J. McClurg, Armed and Dangerous: Tort Liability for the Negligent Storage of Firearms, 32 Conn. L. Rev. 1189, 1208 (2000).
In Palmisano v. Ehrig, 171 N.J.Super. 310, 408 A.2d 1083 (App.Div.1979), certif. denied, 82 N.J. 287, 412 A.2d 793 (1980), an occupant of a second-floor apartment sued for injuries resulting from the discharge of a rifle in the first-floor apartment. The owners of the rifle were charged with negligent storage of firearms even though they were away on vacation when the accident happened. A friend of the owner's son had gained access to the gun and ammunition that had not been locked away. The rifle discharged when it was accidentally dropped. The trial court *851 dismissed the complaint as to the absent owners of the rifle. Id. at 312, 408 A.2d 1083. However, the Appellate Division reversed, allowing the negligent storage claim to proceed. Id. at 313, 408 A.2d 1083.
Firearms have been held to be inherently dangerous instrumentalities. One who possesses firearms is under a duty to use extraordinary care in their handling. The extraordinary degree of care imposed includes a duty to take such steps as will protect an innocent person from the expectable action of other persons. (citation omitted). [Ibid.]
In Blunt v. Klapproth, 309 N.J.Super. 493, 707 A.2d 1021 (App.Div.), certif. denied sub nom., 156 N.J. 387, 718 A.2d 1216 (1998), the dismissal of plaintiff's negligent storage claim was affirmed because there was no evidence that the defendant ever assumed or exercised any control over a.22 caliber rifle purchased by her deceased husband. The gun had been hidden "in the rafters in the back of the basement for safekeeping approximately ten years prior to the shooting." Id. at 511, 707 A.2d 1021. The defendant "never touched the gun" and she was not aware that her grandson, who subsequently used the rifle to shoot the plaintiff, had taken the gun. Ibid. Thus, "the intervening theft and subsequent intentional shooting were not foreseeable, while Palmisano involved an intervening `expectable' negligent act, as the rifle and ammunition were stored together and were readily available." Id. at 514, 707 A.2d 1021.
New Jersey courts have recognized that private individuals who fail to reasonably secure and safeguard their firearms may be liable for the tortious or criminal acts of third parties who gain access to the weapons. Although there is no reported decision in this State requiring a gun dealer to exercise reasonable care in the storage and display of its firearms, there is no logical basis for rejecting such a duty. A commercial gun seller typically possesses many more firearms than an individual owner. In addition, a commercial seller advertises that its weapons are available for sale. For example, in this case, Adventure Sport advertised, "Let your adventure start here! Hunting. Fishing. Archery." Therefore, it can reasonably be anticipated that the risk of theft from a commercial seller of guns is greater than the risk of theft from a private owner. Furthermore, those who profit from the sale of firearms have a special responsibility to the public to adhere to state mandated security regulations that require responsible firearm storage in order to prevent lethal weapons from winding up in the wrong hands.
Firearms are no less deadly when owned by commercial dealers. Thus, the factors favoring imposition of a duty of reasonable care for private owners of guns apply with equal force to commercial owners and sellers. In fact, it can be argued that there are stronger reasons to impose a duty on commercial sellers of guns because their business activities enhance the risk of theft and subsequent misuse. Furthermore, "policy concerns cry out loudly in favor" of requiring gun stores to exercise reasonable care to protect the members of their communities. Valentine, supra, 727 A.2d at 958 (Raker, J., concurring). There is no reasonable basis for distinguishing between private owners and commercial owners. Guns are lethal weapons regardless of who owns them. "All experts, including the NRA, agree that gun owners have a responsibility to safeguard firearms from unauthorized users. It appears the appropriate question regarding liability for unsafe gun storage should not be `why' but `why not?'" McClurg, supra, 32 Conn. L.Rev. at 1244.
*852 It is significant that Adventure Sport had sufficient control, opportunity, and ability to exercise due care to safeguard its firearms. The scope of a duty is determined under the "totality of the circumstances," and must be "reasonable" under the circumstances. Clohesy v. Food Circus Supermarkets, 149 N.J. 496, 514, 520, 694 A.2d 1017 (1997). "Factors to be taken into consideration include the risk of harm involved and practicality of preventing it." J.S., supra, 155 N.J. at 339, 714 A.2d 924. In this case, the risk of theft and misuse of firearms could have been substantially reduced if Adventure Sport tested its audible security alarm system more frequently to ensure it was operating satisfactorily. In addition, with minimum effort, the handguns in the glass display case could have been removed to a vault, safe, or some other secured container, during nonbusiness hours. Because a serious risk of harm could have been so easily prevented, "it is fair to impose a duty." Id. at 339-40, 714 A.2d 924.
A licensed seller of firearms should not be immune from liability if it engages in conduct that contributes to gun violence. Our Court has stated, "the overarching purpose of tort law [is] that wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct." People Express Airlines, Inc. v. Consolidated Rail Corp., 100 N.J. 246, 255, 495 A.2d 107 (1985). It is not unreasonable to require commercial gun sellers to take necessary preventive measures to safeguard and secure weapons capable of instant death. Retail sellers of firearms faced with the prospect of liability in tort for negligent storage of firearms will be more careful in the storage of guns held out for sale to the general public. Thus, the existence of a duty in this case will promote reasonable conduct and discourage negligent security practices. "[F]orcing tortfeasors to pay for the harm they have wrought provides a proper incentive for reasonable conduct." Weinberg, supra, 106 N.J. at 487, 524 A.2d 366.
"Reasonableness, public policy, fairness and common sense also must be taken into account when imposing new legal duties." Sacci v. Metaxas, 355 N.J.Super. 499, 508, 810 A.2d 1119 (App.Div.2002). Imposition of a duty of reasonable care upon Adventure Sport is not unrealistic, unfair or contrary to public policy. On the national level, Congress has specifically determined that "crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem ...." 18 U.S.C.A. § 9229(q)(1)(A). In addition, there can be no doubt about the strong policy of this State to regulate firearms in order to minimize the risks of gun violence. New Jersey has been in the vanguard in the fight to keep firearms out of the hands of all dangerously unfit persons, noncriminal, as well as criminal. Our Legislature has made the following findings:
New Jersey's commitment to firearms safety is unrivaled anywhere in the nation;
New Jersey was the first state to require retail dealers to include, as part of every handgun sale, either a State Police approved trigger lock or a locked case, gun box, container or other secure facility;
To encourage all firearms owners to practice safe storage, the State has waived all sales taxes on trigger locks, firearms lock-boxes and vaults and, under the "KeepSafe" program, offers an instant $5 rebate to all retail firearms purchasers who buy a compatible trigger locking device along with their firearm;
New Jersey was the first state to require all firearms dealers to prominently *853 display State-provided firearms information and safety warnings;
New Jersey was one of the first states to make parents and guardians statutorily responsible for unwittingly or carelessly permitting minors under their control to gain access to loaded firearms;
New Jersey statutorily prohibits anyone under the age of 18 years from purchasing or otherwise acquiring a firearm and permits such minors to possess or carry a firearm only in a very limited number of strictly defined situations and under the direct supervision of a qualified parent, guardian or instructor;
To enforce this strict regulatory scheme, New Jersey imposes harsh penalties, including a mandatory minimum prison term of three years, on anyone who knowingly sells, transfers or gives a firearm to a person under the age of 18 years;

[N.J.S.A. 2C:58-2.2.]
Imposition of a duty upon Adventure Sport to adequately safeguard its inventory of firearms to prevent them from being easily stolen and used in violent crimes is consistent with the long-standing policy of this State to keep guns out of the hands of all dangerously unfit persons. The availability of civil remedies will compliment statutory protections designed to protect the public health, safety and welfare by preventing unauthorized persons, including criminals, from acquiring firearms. Burton v. Sills, 53 N.J. 86, 105, 248 A.2d 521 (1968).
Closely related to the recognition of a duty is the issue of proximate causation, which plaintiffs must also prove in order to hold Adventure Sport liable for the deaths of Giorgio Gallara and Jeremy Giordano. Adventure Sport contends that any negligence on its part cannot be a proximate cause of the ultimate harm because the tragic deaths of the victims resulted solely from the unforeseeable, superseding conduct of Koskovich and Vreeland. Specifically, Adventure Sport asserts, "[the] tragic murders ... are so remote from the alleged negligence of Adventure Sport, and the actions of [Koskovich and Vreeland] so unforeseeable that Adventure Sport's actions cannot be a proximate cause of the murders."
Generally, questions of proximate and intervening cause are left to the jury for its factual determination. J.S., supra, 155 N.J. at 351, 714 A.2d 924; Rappaport v. Nichols, 31 N.J. 188, 203, 156 A.2d 1 (1959). Therefore, in the context of Adventure Sport's summary judgment application, the question becomes whether the facts presented, when viewed in a light most favorable to plaintiffs, compel a finding of no liability as a matter of law.
"Proximate cause is a limitation the common law has placed on an actor's responsibility for the consequences of the actor's conduct." Camp v. Jiffy Lube No. 114, 309 N.J.Super. 305, 309, 706 A.2d 1193 (App.Div.1998). The law of negligence recognizes that "there may be any number of causes intervening between a negligent act and a final injurious occurrence." Davis v. Brooks, 280 N.J.Super. 406, 412, 655 A.2d 927 (App.Div.1993). "The fact that there were also intervening causes which were foreseeable or were normal incidents of the risk created [does] not relieve the tortfeasor of liability." Rappaport, supra, 31 N.J. at 203, 156 A.2d 1. "[A] proximate cause need not be the sole cause of harm. It suffices if it is a substantial contributing factor to the harm suffered." Perez v. Wyeth Laboratories, Inc., 161 N.J. 1, 27, 734 A.2d 1245 (1999).
"Foreseeability in proximate cause context relates to remoteness rather than the existence of a duty." Sanchez v. *854 Independent Bus Co., Inc., 358 N.J.Super. 74, 84, 817 A.2d 318 (App.Div.2003) (citing Clohesy, supra, 149 N.J. at 503, 694 A.2d 1017). "[W]here the original tortfeasor's negligence is an essential link in the chain of causation, such a causal connection is not broken if the intervening cause is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable." Davis, supra, 280 N.J.Super. at 412, 655 A.2d 927. Furthermore, "[a] plaintiff is not required to show that the ultimate harm is foreseeable; all that is required is that a harm is likely to befall a victim." Sacci, supra, 355 N.J.Super. at 510, 810 A.2d 1119; see, e.g., Finney v. Ren-Bar, Inc., 229 N.J.Super. 295, 297, 551 A.2d 535 (App.Div.1988) (tavern liable to plaintiff whose house was burned down by intoxicated patron because all plaintiff was required to show was that the negligent serving of alcohol would lead to some harm).
On rare occasions, New Jersey courts have rejected the imposition of liability where it appears "highly extraordinary" that a defendant's negligent conduct should have brought about the resulting harm. See, e.g., Caputzal v. Lindsay Co., 48 N.J. 69, 77-80, 222 A.2d 513 (holding that even if defect in water softener caused rusty discoloration of water, manufacturer was not liable to plaintiff who sustained idiosyncratic and highly extraordinary heart attack brought on by fright at sight of discolored water); Jensen v. Schooley's Mountain Inn, Inc., 216 N.J.Super. 79, 82, 522 A.2d 1043 (App.Div.), certif. denied, 108 N.J. 181, 528 A.2d 11 (1987) (finding dram shop not liable for death of customer, even if it served alcohol to customer while visibly intoxicated, where customer fell from tree onto riverbank, was knocked unconscious, rolled into river, and drowned because sequence of events was "bizarre").
In James v. Arms Technology, Inc., 359 N.J.Super. 291, 820 A.2d 27 (App.Div.2003), the Appellate Division addressed the issue of proximate causation in determining whether the City of Newark could maintain a claim of negligence against gun manufacturers, distributors and retailers to recover the cost of governmental services associated with gun violence. The city of Newark charged the defendants with negligently flooding the gun market and failing to develop a reasonable distribution scheme, thereby "encouraging an illegal gun market, which foreseeably has fueled crime in Newark and caused the City to expend significant government funds ...." Id. at 305, 820 A.2d 27. The defendants argued that any negligent conduct on its part was too far removed and attenuated from the resulting economic harm to the city of Newark to establish proximate cause. Id. at 311-12, 820 A.2d 27. Applying the "highly extraordinary" standard, the Appellate Division held:
[I]t does not seem "highly extraordinary" that defendants' alleged purposeful or negligent `feeding' of guns to an illegal secondary gun market through their manufacturing, advertising and distribution scheme would yield the criminal use of firearms in Newark, and result in substantial harm to the city.

[Id. at 319, 820 A.2d 27]
The Appellate Division based its decision on the following policy considerations:
Guns are dangerous instrumentalities. In 1977, there were in excess of 32,000 deaths and 64,000 serious injuries related to the use of guns. No one can seriously debate the issue. New Jersey has a strong public interest in protecting the public from the violence and social cost associated with the criminal misuse of firearms. In our view, such a policy would be undermined by concluding that *855 ... defendants should be insulated from liability as a matter of law.

[Ibid.]

Similar policy considerations are present in this case. Furthermore, there is clearly a more substantial connection between the alleged negligent conduct of Adventure Sport and the deaths of Giorgio Gallara and Jeremy Giordano than the alleged negligent conduct and the ultimate harm in James. Thus, a reasonable jury could conclude that the harm allegedly resulting from Adventure Sport's negligence in failing to adequately safeguard its inventory of handguns was not "highly extraordinary."
Unfortunately, gun violence has become an all too common fact of life. "[T]he dangerous propensity of handguns is self-evident, and the consequences of their misuse is well documented...." Id. at 323, 820 A.2d 27. "The notion that it is not foreseeable that a stolen handgun will be used in violent crime is simply nonsense." Valentine, supra, 727 A.2d at 956 (Raker, J., concurring); see also Resteiner v. Sturm, Ruger & Company, Inc., 223 Mich.App. 374, 566 N.W.2d 53, 56 (1997), appeal denied, 457 Mich. 872, 586 N.W.2d 918 (1998) (stating theft of guns and their subsequent criminal misuse "are widely known, commonly recognized and unfortunate realities...."). There "is a strong presumption that virtually all stolen guns end up in the hands of proscribed or dangerous people. This is true partly because the immediate possessor of a stolen gun is, by definition, a thief. But it is also that stolen guns are particularly attractive to people who intend to commit violent crimes with guns because they are virtually impossible to trace." THE ANNALS OF THE AMERICAN ACADEMY OF POLITICAL SCIENCE, GUN CONTROL, 100 (Philip J. Cook ed., 1981).
The New Jersey Supreme Court has stated, "firearms are so inherently dangerous and so magnetic to the young that a person of ordinary prudence in the exercise of reasonable care will take cautious preventive measures commensurate with the great harm...." Stoelting v. Hauck, 32 N.J. 87, 95, 159 A.2d 385 (1960). After stealing three handguns from Adventure Sport, Koskovich stated that he felt powerful. Shortly thereafter, he spoke with Vreeland "about going nuts" because "when you get a gun you go crazy." Eleven days after Koskovich stole the handguns, two of the guns were used to murder Giorgio Gallara and Jeremy Giordano. The same person who stole the guns, committed the murders and the theft, all of which took place in Franklin Borough, Sussex County, New Jersey. Koskovich was directly involved in both crimes and there is a close and significant nexus between the theft of the guns and the ultimate harm. Furthermore, Adventure Sport was in a position to know that its failure to adequately protect its inventory of deadly weapons would create an unreasonable risk of theft and subsequent misuse of its guns. When the evidence is viewed in a light most favorable to the plaintiffs, it cannot be said, as a matter of law, that the terrible crimes committed by Koskovich and Vreeland were so "highly extraordinary," or so far removed from the conduct of Adventure Sport, that "[n]otions of justice, fairness and common sense... compel the conclusion that defendant should not be held legally responsible" for the deaths. Jensen, supra, 216 N.J.Super. at 84, 522 A.2d 1043.
Reasonable minds may differ with respect to whether Adventure Sport was negligent and whether that negligence, if any, was a proximate cause of the wrongful deaths. However, a jury could decide that Adventure Sport should have foreseen or anticipated that stolen guns would likely *856 cause harm, that reasonable security measures would have served as an effective deterrent, and that failure to take such measures was a substantial contributing factor to the ultimate harm suffered. Johnson v. Schragger, Lavine, Nagy & Krasny, 340 N.J.Super. 84, 773 A.2d 1164 (App.Div.2001). Accordingly, the summary judgment application by Adventure Sport is denied.